IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Criminal No.  3:24-CR-61 (TWD) |
| **Plaintiff,** | **Plea Agreement** |
| v. | |
| **JOHANNES HENRICUS VULTO,** | |
| **Defendant.** | |

Pursuant to Rule 11(c)(1)(A) and (B) of the Federal Rules of Criminal Procedure, Carla B. Freedman, United States Attorney for the Northern District of New York, Michael F. Perry, Assistant United States Attorney, and James T. Nelson, Senior Trial Attorney, United States Department of Justice, Consumer Protection Branch, and the defendant, **JOHANNES HENRICUS VULTO**, personally and by the defendant's attorneys, Douglas A. Fellman and David I. Sharfstein, have agreed upon the following:

SCOPE

1. This document contains the complete and only plea agreement (hereafter, "Agreement") between the United States Attorney for the Northern District of New York and United States Department of Justice, Consumer Protection Branch, and the defendant. This Agreement supersedes and replaces any and all prior formal and informal, written and oral, express and implied, plea agreements between the parties. No other Agreement, understanding, promise, or condition between the United States Attorney for the Northern District of New York and United States Department of Justice, Consumer Protection Branch, and the defendant exists, except as set forth in this Agreement.

2. This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States

1

or any of its agencies of any administrative or judicial civil claim. The obligations of this Agreement are limited to the United States Attorney for the Northern District of New York and United States Department of Justice, Consumer Protection Branch, and cannot bind any other federal, state, or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

## THE PLEA

3. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), the defendant will enter a plea of guilty to a one-count Information, in which the defendant is charged with the strict liability misdemeanor offense of Introduction of Adulterated Food into Interstate Commerce, in violation of Title 21, United States Code, Sections 331(a) and 333(a)(1). This offense is a class A misdemeanor offense under 18 U.S.C. Section 3559(6). Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), if the Court does not accept the recommendations of the parties as set forth below, the defendant understands that he does not have the right to withdraw his plea of guilty.

## ELEMENTS OF THE CHARGE

4. The defendant has personally read the charge to which the defendant is pleading guilty, and the charge has been explained to the defendant by the defendant's attorney. Furthermore, the defendant understands that the following are the elements of the offense of introduction of adulterated food into interstate commerce, in violation of Title 21, United States Code, Sections 331(a) and 333(a)(1), to which the defendant agrees to plead guilty. The defendant admits that the defendant's conduct satisfies each and every one of these elements:

<u>First.</u> That the defendant, a person, caused the introduction of, or delivered for introduction, into interstate commerce, articles of food; and

<u>Second.</u> That the food was adulterated.

## POTENTIAL PENALTIES

5. The defendant understands, agrees, and has had explained to him by counsel that the provisions of law pursuant to which Defendant is pleading guilty, to wit, violation of Title 21, United States Code, Sections 331(a) and 333(a)(1), provide for the following possible statutory maximum sentence, as applicable: one (1) year imprisonment; a fine of $250,000; a special assessment of $25; restitution as ordered by the Court; one (1) year supervised release; and a five (5) year term of Court supervision.

6. The parties agree that the defendant will pay a criminal fine of $100,000 to the Clerk of the United States District Court within ten business days of the Court's entry of judgment and conviction.

7. In addition to imposing any other penalty, the sentencing court may require the defendant to serve a term of supervised release of up to 1 year, to begin after imprisonment. *See* 18 U.S.C. § 3583. A violation of the conditions of supervised release during that time period may result in the defendant being sentenced to an additional term of imprisonment of up to 1 year.

8. The defendant agrees to pay the mandatory special assessment at the time of sentencing in a payment acceptable to the Clerk of the United States District Court, and further understands that the defendant will be required to do so as a condition of this Agreement. Failure to comply with this requirement, however, will not constitute grounds for the defendant to withdraw the defendant's plea of guilty.

## WAIVER OF RIGHTS TO APPEAL AND COLLATERAL ATTACK

9. The defendant waives (gives up) any and all rights, including those conferred by 18 U.S.C. § 3742 and/or 28 U.S.C. §§ 2241 and 2255, to appeal and/or to collaterally attack the following (except that the defendant does not waive the right to raise a claim based on alleged ineffective assistance of counsel):

a)  The conviction(s) resulting from the defendant's guilty plea;

b)  Any claim that the statute(s) to which the defendant is pleading guilty is unconstitutional;

c)  Any claim that the admitted conduct does not fall within the scope of the statute;

d)  Any sentence to a term of imprisonment of 6 months or less;

e)  Any sentence to a fine within the maximum permitted by law;

f)  Any sentence to a term of supervised release within the maximum permitted by law;

g)  Any order of forfeiture or restitution imposed by the Court that is consistent with governing law and is not contrary to the terms of this Agreement.

Nothing in this appeal waiver is meant to be or should be construed as a representation of or agreement concerning the appropriate sentence in this case.

## ADVISORY SENTENCING GUIDELINES

10. The defendant understands that the Court will calculate the defendant's offense level and criminal history category under the United States Sentencing Guidelines, and that the Court will use those calculations to arrive at an advisory sentencing range under the Guidelines. The defendant understands that the Court must consider the advisory Sentencing Guideline range when imposing sentence. The Court shall also consider the other factors listed under Title 18, United States Code, Section 3553(a) in determining the specific sentence to be imposed.

11. The defendant understands that, while the United States Sentencing Guidelines are not binding upon the Court, the Court is required to consider the Sentencing Guidelines in imposing sentence, and that, even though not required to do so, the Court may choose to impose a sentence in accordance with the Sentencing Guidelines.

12. Based on the information currently available, the defendant and the United States agree on the following points regarding the application of the Sentencing Guidelines to the offense to which the defendant is pleading guilty:

4

a.  The parties agree that the base offense level is 6, pursuant to Guideline Section 2N2.1, and that Section 2B1.1 is not applicable.

b.  The parties agree that the United States will not pursue an upward departure, including pursuant to Section 5K2.1 or 5K2.2.

c.  The parties agree, based upon facts currently known by the United States, that the defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for the defendant's criminal conduct in accordance with Section 3E1.1(a) of the Sentencing Guidelines and, therefore, a two-level reduction in the offense level is appropriate. Acceptance of personal responsibility shall include cooperating fully with the United States Probation Office in the preparation of a presentence report and not committing any bond violations while on pretrial release, including but not limited to the commission of any local, state or federal offenses. This Agreement does not preclude the United States from changing its position if new evidence to the contrary is discovered or if the defendant later demonstrates a lack of acceptance of personal responsibility for the defendant's criminal conduct.

d.  The parties agree that the defendant is not eligible for an additional one level reduction in accordance with Section 3E1.1(b) because the offense level in this case is not level 16 or greater; however, the parties agree, based upon the facts currently known by the United States, that the defendant has fully complied with the government's investigation, as referenced in paragraph 28 below, and that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently.

13. Therefore, based on the facts now known to the United States, the anticipated offense level would be 4.

14. The defendant and the United States agree that, depending on the applicable criminal history category, a level 4 offense is a Zone A offense pursuant to 5C1.1(b). Section 5C1.1(b) provides that a sentence of imprisonment is not required where the applicable guideline is in Zone A.

15. The defendant and the United States agree that the above statements regarding Sentencing Guidelines are not binding on the Court and relate only to the positions the parties take regarding the applicable advisory Sentencing Guideline range based upon the information of which they are currently aware. While the Court is not bound to impose a sentence within the applicable sentencing guidelines range, it must take into account the sentencing guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a).

16. The defendant agrees that at the time of sentencing, the Court will consider but will not be bound by any recommendation made by any party, and that the Court will be free to impose whatever sentence it deems appropriate up to the statutory maximum. The defendant agrees and understands that the defendant will not be allowed to withdraw the defendant's guilty plea because of an objection to the calculation of the Sentencing Guidelines, or to the Court's sentencing findings or rulings, or because the defendant receives a sentence higher than that recommended under the Agreement.

## FOIA WAIVER

17. The defendant waives all rights to obtain, directly or through others, information about the investigation and prosecution of this case under the Freedom of Information Act and the Privacy Act of 1974, 5 U.S.C. Sections 552, 552A.

## THE UNITED STATES ATTORNEY'S AND DEPARTMENT OF JUSTICE'S OBLIGATIONS

18. The United States Attorney for the Northern District of New York and Department of Justice, Consumer Protection Branch, agree that they will bring no additional criminal charges

against the defendant based on conduct described in the information in Case No. 3:24-CR-61 (TWD) and/or in the paragraphs of this Agreement entitled "Stipulation of Facts," occurring before the date on which the defendant signs this Agreement, except for any crime of violence and any crime unknown to the United States Attorney for the Northern District of New York or Department of Justice, Consumer Protection Branch prior to the time this Agreement is signed by the parties.

19. The United States agrees that at the time of sentencing it will fully inform the Court of the nature, extent, and value of any cooperation rendered by the defendant.

## STIPULATION OF FACTS

20. The defendant admits the following facts, that those facts demonstrate the defendant's guilt for the offense to which the defendant is pleading guilty, and that there are no facts establishing a viable defense to that offense:

21. The defendant admits and agrees that beginning in or around December 3, 2014, in the Northern District of New York and elsewhere, and continuing until in or around March 2017, he did cause the shipment in interstate commerce of adulterated food, namely cheese made from unpasteurized milk produced at Vulto Creamery, in violation of 21 U.S.C. §§ 331(a) and 333(a)(1).

22. Specifically, in or around June 2012, Johannes Henricus Vulto ("Vulto" or "the defendant") opened Vulto Creamery LLC ("Vulto Creamery"), a facility that manufactured and sold cheese made from unpasteurized milk. At all relevant times, the manufacture of cheese from unpasteurized milk was legal, but the shipment in interstate commerce of food made under insanitary conditions violated the law. As the general manager and owner of the creamery, Vulto managed the business and supervised a staff that, over time, consisted of a total of four part-time employees until it closed on or about March 2017 following an outbreak of listeriosis caused by contamination at the creamery.

23. Both before and while Vulto Creamery was in business, Vulto registered for an upstate New York cheese publication which issued monthly newsletters. In these newsletters, Vulto received a range of information contained in articles and commentary. Among this information was articles regarding other cheese facilities that conducted recalls or shut down because of positive environmental swabs for Listeria. In addition, as a dairy producer, Vulto was required each year to attend safety meetings hosted by the New York State dairy regulator. At one such safety meeting in 2014, Vulto was informed that raw milk cheese is 112 times more likely to cause listeriosis than pasteurized cheese, and that, in some circumstances, the discovery of Listeria in locations at a food facility, even in locations not in direct contact with food, had resulted in a product recall.

24. From on or about July 28, 2014, to on or about February 19, 2017, Vulto at times swabbed areas throughout Vulto Creamery as part of Vulto Creamery's program to monitor the environment for pathogens. He sent the swabs to a laboratory to be tested for Listeria species. During this period, Vulto swabbed on 20 different occasions, and found positive results for Listeria species in Vulto Creamery on 18 of those occasions. The defendant caused to be tested a total of 198 swabs, 54 of which (more than 27 percent) were positive for Listeria species.

25. Even though Vulto received guidance from an individual active in the dairy food safety space (Individual #1) that testing food contact surfaces was not required, Vulto periodically tested food contact surfaces. Ten of those 54 tests of food contact surfaces at Vulto Creamery (more than 18 percent) were among the results positive for Listeria. Vulto stopped testing food contact surfaces as of June 17, 2015.

26. Vulto took certain remedial actions following a positive test, including but not limited to extra cleaning and sanitizing the affected area. However, he did not immediately retest the area that he cleaned and sanitized to ensure that Listeria species was not still present. Instead,

8

he resumed producing cheese and did not test the area again for Listeria species until the next time he performed a routine swab of the facility.

27. Beginning in or about March 2014, Mr. Vulto contacted Individual #1 for advice regarding initiating his environmental monitoring program, and after that conversation, Vulto decided to take 10 samples a month for Listeria species. There are more than 20 species in the Listeria genus family, and Listeria monocytogenes is one species that can cause the illness listeriosis in humans. Vulto received indications from several sources, including Individual #1 and Individual #2, that he should set and follow a monthly environmental sampling protocol. On or about March 10, 2015, Vulto wrote Vulto Creamery's Environmental Sampling procedure, stating: "Samples of Listeria genus are taken monthly."

28. On or about December 29, 2015, Vulto approved Vulto Creamery's "Environment Cleaning and Maintenance of the Creamery," which provided: "Ten swabs are taken each month . . . . Results are used to correct problems and prevent the spread of the pathogens from the environment into the products." Notwithstanding this written procedure, Vulto failed to swab at all during several months. He swabbed eight times in 2015, six times in 2016, and once in 2017 prior to the closure of Vulto Creamery in March 2017.

29. On or about January 3, 2015, having had three swabs test positive for Listeria species on his wooden aging boards and one swab test positive on his cheese wash brushes, Vulto emailed an employee an article detailing a recall caused by Listeria on cheese brushes and aging boards. In the email, Vulto told his employee that deviations from the Listeria testing protocol can make the risk of cheese contamination much greater.

30. At times, Vulto sought feedback from those active in the dairy safety space. In the spring of 2015, Vulto corresponded and met with an individual with a PhD and undergraduate and graduate degrees in food science (Individual #2) to discuss his environmental monitoring results.

9

This person provided feedback to Vulto, some of which Vulto implemented. This individual advised Vulto to continue to sample monthly and re-evaluate the frequency of testing if he received negative results for three straight months. Vulto never had negative results for three straight months.

31. In the fall of 2015, Vulto invited Individual #1 and another colleague of Individual #1 ("Individual 3") to his facility. Individual #1 and #3 provided feedback to Vulto on cleaning techniques and products, which Vulto implemented and purchased. They also took environmental swabs at Vulto's request. After the 2015 visit, Vulto emailed Individual #1: "I am anxiously awaiting the results of the swabs. Hope I will not have too many sleepless nights." At the time, Vulto had swabbed Vulto Creamery 12 times over the past 15 months and had received positive results for Listeria species 11 times.

32. Later in November 2015, Individual #1 provided a list of sanitation recommendations, which Vulto implemented. In January 2016, Vulto invited Individual #1 and #3 back to the facility to take additional environmental swabs at Vulto's request.

33. On or about December 2, 2015, Vulto completed a two-day food safety course at a university with an active dairy management program, where he was told that Listeria monocytogenes had a 20% mortality rate, and that non-pasteurized products were 150 times more likely to cause disease outbreaks.

34. On or about March 7, 2017, after the Food and Drug Administration linked Listeria monocytogenes in Vulto Creamery's cheese to an outbreak of listeriosis, Vulto shut down Vulto Creamery and issued a partial cheese recall that was expanded to a full recall within weeks. The Listeria monocytogenes outbreak from Vulto Creamery's cheese resulted in eight hospitalizations and two deaths.

35. Following the recall, Vulto took responsibility by, among other things, immediately closing his facility, assisting the FDA's investigation into the outbreak, agreeing to a permanent injunction on manufacturing food, and complying promptly with investigative requests.

36. Vulto's conduct described above was in the course and scope of his employment at Vulto Creamery and done in part to benefit Vulto Creamery.

## VIOLATION OF AGREEMENT BY DEFENDANT

37. The defendant further agrees that if the defendant violates the terms of this Agreement, the United States has the option to declare the Agreement null and void. In the event the United States exercises its option to declare the Agreement null and void, the United States will be completely released from all of its obligations under this Agreement and the United States will be free to file additional charges against the defendant. In the event, however, the United States exercises its option to declare the Agreement null and void, the defendant will not be allowed to withdraw from any previously accepted guilty plea.

38. The defendant also agrees to waive any and all double jeopardy rights and the applicable statute of limitations should the United States decide to reinstate any charges against the defendant after a violation of this Agreement. The defendant agrees, however, that under such a circumstance the defendant will not be allowed to withdraw any previously accepted guilty plea.

39. Whether or not the defendant has violated the terms of the Agreement shall be determined by the Court. The burden of proof shall rest with the United States to establish by a preponderance of the evidence that the defendant violated the terms of the Agreement.

## ACKNOWLEDGMENTS OF DEFENDANT AND DEFENSE COUNSEL

40. The defendant has the right to be represented by counsel—and if necessary have the court appoint counsel—at trial and at every other stage of the proceeding. Defense counsel

has advised the defendant of nature of the charges to which the defendant is agreeing to plead guilty and the range of possible sentences.

41. The defendant understands that by entering a plea of guilty, the defendant is waiving certain of the defendant's rights. Specifically, the defendant understands that by pleading guilty the defendant is waiving the following rights, among others:

a. The right to plead not guilty or persist in the plea of not guilty if already made. If the defendant persisted in a plea of not guilty to the charges the defendant would have the right to a public and speedy trial.

b. The right to a trial by jury. The defendant has an absolute right to a jury trial. The jury would be composed of twelve persons selected at random. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that the defendant is presumed innocent, and that it could not convict the defendant unless, after hearing all the evidence, it was persuaded that the United States had met its burden of proving the defendant guilty beyond a reasonable doubt. The defendant could also ask for a trial by the Judge instead of a trial by a jury.

c. The right to the assistance of counsel at trial. The defendant has the right to be represented by an attorney at every stage of the proceedings, including trial. If the Court finds the defendant is unable to afford an attorney, one will be appointed to represent the defendant at no cost to the defendant. By entering a guilty plea pursuant to this Agreement, the defendant will not be represented by counsel at a trial on these charges since there will be no trial.

d. The right to confront and cross-examine adverse witnesses. At a trial, the United States would be required to present its witnesses and other evidence against the defendant. The defendant would be able to see and hear those government witnesses and the defendant's attorney would be able to cross-examine them. In turn, the defendant's counsel could present

12

witnesses and other evidence on the defendant's behalf. If the witnesses for the defendant refused to appear voluntarily, their attendance could be required through the subpoena power of the court.

   e. The right against compelled self-incrimination. At a trial, the defendant would have a privilege against self-incrimination so that the defendant could decline to testify, and no inference of guilt could be drawn from the defendant's refusal to testify. If the defendant desired to do so, the defendant could testify on the defendant's own behalf.

  42. The defendant understands that by pleading guilty the defendant is waiving all the rights set forth in the prior paragraphs. The defendant's attorney has explained to the defendant those rights and the consequences of the waiver of those rights.

**AGREED:**

**Defendant's Attorney:**

43.   I have read this Agreement and discussed it fully with my client, and I am satisfied that my client fully understands its contents and terms. It accurately and completely sets forth the entire Agreement. I concur in the guilty plea as set forth in this Agreement. No threats, promises, or representations have been made, nor agreements reached, express or implied, to induce my client to plead guilty other than those stated in this written Agreement.

Date: 3/5/24

David I. Sharfstein
Attorney for Johannes Henricus Vulto

**Defendant:**

44. I have read this entire Agreement carefully and have discussed it fully with my attorney. I fully understand this Agreement and accept and agree to it without reservation, including the paragraphs labeled "Waiver of Rights to Appeal and Collateral Attack." I am entering into this Agreement voluntarily and of my own free will in order to gain the benefit of the promises made by the United States.

I am pleading guilty because I am in fact guilty, and I agree that the facts stated in this Agreement about my criminal conduct are true. No threats, promises, or commitments have been made to me or to anyone else, and no agreements have been reached, express or implied, to influence me to plead guilty other than those stated in this written Agreement, nor am I under the influence of anything that could impede my ability to understand fully this Agreement. I am satisfied with the legal services provided by my attorney in connection with this case, this Agreement and matters related to it. I further understand that by signing below I am stating I agree with everything stated in this section of the Agreement and I am accepting and entering into this Agreement in its entirety.

I hereby reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Agreement.

Date: 3/5/24

Johannes Henricus Vulto
Defendant

**United States:**

45. On behalf of the United States of America, I accept and agree to this Plea Agreement.

Date: 3/5/2024

By: Michael F. Perry
Assistant United States Attorney
United States Attorney's Office
Northern District of New York

Date: 3/5/2024

By: James T. Nelson
Senior Trial Attorney
United States Department of Justice
Consumer Protection Branch